# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| | ) Case No. 1:20-cv-475 (MAD/DJS) |
| THOMAS HART, LISA HART, KEVIN MCDONALD, | ) |
| SARAH MCDONALD,1667 WESTERN AVENUE, LLC and | ) **COMPLAINT FOR** |
| RED-KAP SALES, INC. | ) **DECLARATORY AND** |
| | ) **INJUNCTIVE RELIEF** |
| Plaintiffs, | ) |
| -against- | ) |
| | ) |
| TOWN OF GUILDERLAND,  PLANNING BOARD AND ZONING | ) |
| BOARD OF APPEALS OF GUILDERLAND, PYRAMID | ) |
| MANAGEMENT GROUP, LLC, RAPP ROAD DEVELOPMENT, LLC | ) |
| and CROSSGATES RELEASECO, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

_____

## INTRODUCTION

1.      This action is commenced pursuant to 42 U.S.C. §1983 as a result of a series of actions by the defendant Town of Guilderland taken to facilitate the Rapp Road Development project in Guilderland, New York, including the clear cutting of property in violation of the Clean Water Act, (CWA), the Endangered Species Act, (ESA), the New York State Environmental Quality Review Act, (SEQRA), and plaintiffs' due process rights and privileges guaranteed under the Fourteenth Amendment of the United States Constitution.

2.      Defendants' actions have caused an irretrievable commitment of resources and irreparable damage to the environment and evince municipal defendants' unalterably closed mind pre-determining the outcome of the project's land use permitting process.

3.      Plaintiffs seek A) an order enjoining further clear cutting or construction activities on Sites 1-3, B) an order enjoining defendant Planning Board's continued SEQRA review and C) an

1

order requiring re-establishment of lead agency among the involved agencies as provided by

SEQRA to restore a fair and impartial examination of the project's environmental impacts and

protect plaintiffs' substantive due process rights and property interests through meaningful

analysis of reasonable alternatives as required by SEQRA.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 USC §§1331, 2201(a). The relief sought is

authorized by 28 USC §2201(a) and §2202.

5.      Venue is proper in the Northern District of New York under 28 USC §1391(e)(1)(A)

because this is a civil action brought against the Town of Guilderland within the Northern

District of New York in Albany County, New York and plaintiffs own and control property

within Guilderland proposed to be developed by corporate defendants.

## DEFENDANTS

6.      The defendant Town of Guilderland, (Town), maintains offices at 5209 Western

Turnpike, Guilderland, New York.

7.      The Town owns Westmere Terrace and its cul-de-sac proposed to be developed as part of

corporate defendants' plans. The Town also owns Lawton Terrace, Rielton Court, Tiernan Court

and Gabriel Terrace, along with their 60-ft. rights of way, located on the north of Western

Avenue and east of Crossgates Mall Road (Lawton neighborhood).

8.      Town officers authorized the clear cutting of woodlands on the west side of Lawton

Terrace, (Lawton woodlands), as further discussed below.

9.      Defendant Planning Board of Guilderland maintains offices at 5209 Western Turnpike,

Guilderland, New York, and is the lead agency conducting an environmental impact review of

the corporate defendants' proposed Rapp Road Development (project).

10.     Defendant Town Zoning Board of Appeals is responsible for review of the corporate defendants' special use permit application.

11.     Defendant Pyramid Management Group, LLC, owns or controls the Crossgates mall in the Town.  Pyramid and its subsidiaries are pursuing land use permitting for the project located adjacent to the mall shown as Sites No. 1, No. 2 and No. 3 on the project's concept plan.

12.     Defendant Rapp Road Development, LLC, is a subsidiary of Pyramid and is seeking land use permits from various agencies.

13.     Defendant Crossgates Releaseco, LLC, is a subsidiary of Pyramid and is the record owner of the tax parcels that comprise Sites No. 1, No. 2 and No. 3, excepting Town-owned properties.  Crossgates Releaseco, LLC has submitted a special use permit application to the Town's Zoning Board of Appeals for the development of Site No. 2.

## PLAINTIFFS

14.     Plaintiffs Lisa and Thomas Hart live in their home at 3 Westmere Terrace in the Town of Guilderland.  Mrs. Hart's Affidavit in Support details their proximity and property interests and is incorporated herein by reference as is the Affirmation of James Bacon which includes further proximity details.

15.     Plaintiffs Kevin and Sarah McDonald live in their home with their children at 29 Westmere Terrace at the end of Westmere Terrace just before the cul-de-sac.  Mr. McDonald chose his home's location as the "quality of life and security this neighborhood provides was ideal with less traffic and peaceful surroundings." See McDonald Affidavit at ¶1.  His affidavit details their proximity and property interests and is incorporated herein by reference. The Affirmation of James Bacon includes further proximity details.

16.     Plaintiff 1667 Western Avenue, LLC owns 0.7 acres of property at 1667 Western Avenue in the Town of Guilderland which is improved with a Mobil gasoline station and a 1906 sq. ft. convenience store. Plaintiff's property is bordered on three sides by Site No. 3, which is comprised of primarily of properties owned or controlled by Pyramid and/or its subsidiary Crossgates Releaseco, LLC, other than the four Town roads thereon.

17.     Plaintiff Red-Kap Sales, Inc. is a gasoline distributor which operates the Mobil station at 1667 Western Avenue in the Town of Guilderland, New York.

## STATEMENT OF FACTS

18.     Pyramid owns and operates the Crossgates Mall comprised of 1.7 million square feet of commercial uses on approximately 115 acres in the Town of Guilderland. See Exhibit A.[1] The mall includes 212 stores and restaurants as well as an 18-screen IMAX theater.

19.     Two residential neighborhoods exist south of the mall on Westmere Terrace and in the Lawton neighborhood, comprised of the Lawton woodlands, Lawton Terrace, Gabriel Terrace, Rielton Court and Tiernan Court.  Exhibit A.

20.     The Westmere and Lawton neighborhoods are similar in being relatively quiet areas with cul-de-sacs and little traffic.  Westmere residents routinely walk or bring their children to the Lawton neighborhood for recreational activities, such as bicycling. (See affidavits of plaintiffs Hart and McDonald.)

21.     Between Lawton Terrace and Westmere was a forested area of approximately eight (8) acres of wildlife habitat which residents also enjoyed as open space and a noise buffer. See Exhibit B,  Pyramid's archeological study containing pre-clear cutting photographs.

---

[1] All exhibits identified herein are incorporated by reference and attached to the "Affirmation of James Bacon in Support" included herewith.

22.     Erik Kiviat, Ph.D., a professional wetlands scientist and co-founder of the environmental science organization Hudsonia, Ltd., recently studied the flora and fauna of these woodlands and issued a report. Exhibit C.

23.     The Lawton woodlands included a variety of trees, some more than three feet in diameter, with white pines, eastern cottonwoods and red maples dominating the woodlands along with pitch pine, black walnut, black locust and tree-of-heaven.  The forest was of "modest age" as it contained some large, dead eastern cottonwood and red maple trees. *Id.* at pgs. 3-4.

24.     The woodlands also included the old road bed of Rapp Road and man-made drainage channels that had become wetlands extending in a north south direction and west towards the Crossgates Mall Road. *Id.* at pg. 4 and see Map 2 of "ditch" and photographs Nos. 18 and 19 at Exhibit B.

25.     A number of animals use or inhabit the forest such as deer and other common mammals and birds, such as the pileated woodpecker and red-tailed hawk, among other bird species. Exhibit C.

26.     Dr. Kiviat also reported that the woodlands were:

> …part of an extensive network of preserved and non-preserved greenspaces… [and] …have great importance for biodiversity, water resources, carbon storage, microclimate, and amenity. Clearing and development of these sites would cause further fragmentation and degradation of habitat for many common and uncommon wildlife and plant species.

27.     Significantly, the woodlands potentially support a number of federal and state-listed endangered, threatened, rare and special concern species. *Id.*

28.     Several bat species including the Eastern red bat, silver-haired bat, Indiana bat and Northern Long-eared bat, "roost in trees during the active season… and could occur in the study area woodlands where there are dead and live trees with suitable bark voids." *Id.* at pg. 5.

29.     The Indiana bat is a federally and state-listed endangered species and the Northern Long-eared bat, (NLEB), is a federally and state-listed threatened species.

30.     The Indiana bat was one of the originally listed endangered species in 1967.  Two of the seventeen Indiana bat hibernacula in New York are located in Albany County. https://guides.nynhp.org/indiana-bat/#conservation-management.

31.     The Lawton woodlands are well within the species' nesting range since Indiana bats may fly "hundreds of miles" to roosting areas. See New York State Department of Environmental Conservation (NYSDEC) website at https://www.dec.ny.gov/animals/6972.html.

32.     The NLEB was listed as "threatened" by the United States Fish and Wildlife Service (USFWS) under the federal Endangered Species Act (ESA) in 2015. The federal listing was the result of a dramatic population decline caused by white-nose syndrome that causes hibernating bats to starve to death. As a result, the NLEB's New York population has suffered a 98% decline. See NYSDEC's website at https://www.dec.ny.gov/animals/106713.html.

33.     NYSDEC recommends avoiding NLEB potential habitat disturbance absent exigent circumstances:

> For all projects that require the removal of trees… Leave snag and cavity trees uncut unless their removal is necessary for protection of human life and property.

https://www.dec.ny.gov/animals/106713.html.

34.     The mall has transformed Western Avenue into a heavily trafficked route impacting local residents especially in the Westmere and Lawton neighborhoods.

35.     Westmere residents have been following Pyramid's development plans for years concerned with the potential overdevelopment and urbanization of their neighborhood.

36.     Pyramid's expansion plans have caused Westmere residents to place heightened value on remaining open spaces, especially the neighboring woodlands and Lawton neighborhood where

the Harts, McDonalds and other Westmere residents enjoy walking or cycling with their

children. (See Hart affidavit at ¶10 and McDonald affidavit at ¶16.)

37.     Largely as a result of the mall's impact on the community, in late 2016, Guilderland

issued the Westmere Corridor Study (WCS) which recommended a new, Transit Oriented

District (TOD), zoning overlay, primarily to encourage Pyramid to pursue mixed-use, non-auto

dependent development, *e.g.*:

> A TOD strategy inherently requires a focus on improving access to non-auto
> oriented modes of transportation and integrated street networks…. [and]
> …reduced emphasis on the automobile through walkable, compact design. An
> abundance of surface parking directly conflicts with this concept in both form and
> function.

WCS at pg. 62 and pg. 64. (Available at https://www.townofguilderland.org/advanced-

search?keywords=Westmere+Corridor+Study).

38.     The Town adopted the TOD overlay in 2018:

> …to support and incentivize development that adequately protects nearby
> residential neighborhoods and utilizes resources within and near the TOD's
> boundary, including regional shopping, entertainment, and employment centers, a
> robust transit service with high ridership and proposed enhancements, direct
> vehicle access to the interstate highway system, and a nearby local business
> community. The TOD District encourages more compact development, traffic-
> calming measures, better access management, improving the environment for
> non-automobile-oriented modes of transportation, reducing the number of
> required parking spaces, supporting mixed-use buildings and pedestrian linkages,
> and focusing intense development away from existing residential neighborhoods.

Town Code § 280-18.1.

39.     Pyramid publicly stated it would use the TOD to create a mixed-use community:

> Crossgates has bought property in the surrounding area, and is hoping to build
> something that is first floor commercial, upper floors residential
> apartments/condos; perhaps a civic component as well, maybe government
> offices, a Police station, and medical offices all of which will help support the
> overall health of Crossgates.

Exhibit D.

40.     However, privately, Pyramid was purchasing land to consolidate tax parcels and build large-scale single use development.

41.     Pyramid would purchase properties surrounding the mall through subsidiaries and require non-disclosure agreements to limit public knowledge and scrutiny of its development plans. See Affidavit of Lisa Hart at ¶2.

42.     The Town facilitated Pyramid's plans by rezoning Pyramid's properties and transferring property to Pyramid.

43.     An example of the Pyramid/Town cohesive action involves Pyramid's hotel on Western Avenue. At the end of 2016, Pyramid publicly stated it had "no plans to build a hotel." (See July 18, 2019, Altamont Enterprise article included with the Hart Affidavit.)

44.     However, Pyramid presented plans for a 5-story 192-unit hotel with 192 parking spaces just three months later. *Id.*

45.     By June 2017, the Town had rezoned Pyramid's property to allow the hotel, granted subdivision and site plan approval and abandoned a Town road, (Lehner Road), to convey to Pyramid.

46.     Similarly, while Pyramid publicly promised development consistent with the TOD's mixed uses, it had already completed detailed plans to consolidated multiple tax parcels for single large scale residential and commercial projects.

47.     Specifically, in 2017, Pyramid completed detailed site plans for a single retail store, Costco, that would encompass almost all of the Lawton neighborhood and its adjacent woodlands. Exhibit E, January 2, 2018 "Exploration Location Plan" referencing "Concept Plan SK-2 Revised" dated November 1, 2017.

48.     Pyramid also conducted 33 soil borings and 13 soil test pits within the Lawton

neighborhood from January 10, 2018 through January 18, 2018. *Id.*

49.     Pyramid's map shows ten of those soil boring and test pits to be located in the Lawton

Terrace, Tiernan Court and Rielton Court rights of way. *Id.* compared with Exhibit A.

50.     Town authorization is required before a private entity works in any Town right of way.

(See Town Board authorization allowing work in the Lawton/Tiernan right of way at Exhibit G,

at page 5 of the minutes [numbered as page 203].)

51.     Upon information and belief, Pyramid did not obtain similar Town authorization for its

soil borings and test pits in the Lawton neighborhood.

52.     Through 2018, Pyramid completed a number of plans for the Costco:

- ALTA/NSPS Land Title Survey for COSTCO, Inc; Albany Crossgates Mall, (1/5/18);
- Soil Boring plans, (1/2/18);
- Soil Profile Map, (2/9/18);
- Subsurface Profile Maps, (2/12/18);
- Exploration Logs, (1/12/18);
- Laboratory Analysis, (2/15/18);
- National Inventory Wetland Map, (7/16/18);
- An Environmental Resource Map, (8/3/18);
- Erosion and Sediment Control Plans, (11/26/18, 7 of 20), and;
- an Erosion Control Final Phase plan, (11/26/18, 10 of 20).

See "Stormwater Management Plan Site 2 – Costco" on the Town's website at

https://www.townofguilderland.org/planning-board/pages/environmental-impact-statement-rapp-

road-residentialwestern-avenue-mixed-use.

53.     However, Pyramid did not officially submit the Costco plans to the Town and told the

Westmere neighbors that it had no plans to develop other sites except Site No. 1. Hart Aff. ¶6

and McDonald Aff. ¶14.

54.    Pyramid filed land use plans for Site No. 1 only, telling the public in December, 2018, that Site No. 2 "was not a point of focus," though Pyramid had been working on extensive plans as described above for more than a year. (See above ¶52 and Exhibit E.)

55.    On November 15, 2018, Pyramid applied for subdivision approval for Site No. 1 to consolidate five tax lots to one parcel for the "Rapp Road Residential Project" consisting primarily of "222 units across five buildings on a +/-19.68 acre site." Exhibit H.

56.    Four days later, the Applicant filed a site plan application for the same project. Exhibit I.

57.    James Soos, of Pyramid Management Group, LLC, signed the subdivision and site plan applications certifying that he received authorizations to proceed from all the property owners within the development site. *Id.*

58.    However, Pyramid proposed to use the Town's cul-de-sac of Westmere Terrace as part of its development. No Town resolution has authorized Pyramid to proceed with an application to develop the Town's Westmere property.

59.    Pyramid submitted Part 1 of the model SEQRA, Environmental Assessment Form, (EAF), dated November 19, 2018, affirming the "Project is residential." Exhibit J at D.2(k).

60.    The EAF does not identify in its "Government Approvals" section that the development of Site No. 1 was contingent upon the Town Board approving and conveying the Westmere cul-de-sac to Pyramid.

61.    On or about February 12, 2019, the Board circulated its intent to be lead agency advising it intended to conduct a coordinated review as the project was a SEQRA Type 1 action.

62.    NYSDEC responded citing concerns regarding impacts to endangered and special concern species. Exhibit K.

63.    On May 13, 2019, the Albany County Planning Board, issued a disapproval letter, primarily due to the project's large-scale single-use incompatibility with the TOD zone's mixed-use purposes. Exhibit L.

64.    On July 10, 2019, the Guilderland Planning Board established itself as lead agency accomplishing a significant SEQRA milestone. Exhibit M.[2]

65.    The Applicant re-signed Parts 1 and 2 of the EAF on July 19, 2019, continuing to describe the project as "a 222 unit apartment/townhome development on 19.68 acres" with no mention of the proposed development of Sites 2 and 3. Exhibit N.

66.    On August 14, 2019, the Planning Board voted to require a Draft Environmental Impact Statement, (DEIS), and likewise described the project as "a 222 unit apartment/townhome development on 19.68 acres."  Exhibit O.

67.    NYSDEC published notice of the establishment of lead agency in its Environmental Notice Bulletin, (ENB), citing the availability of a draft scope and still described the project as all residential except for 3,900 sq. ft. of commercial space. Exhibit P.

68.    However,  when the Town published its positive declaration, it identified the project had expanded to include the development of two new sites:

> A second development area (Site 2 on the attached plan), is a proposed retail site. Site 2 is located on the corner of Crossgates Mall Road and Western Avenue and proposes ±160,000 square foot of retail and a fueling facility on ± 15 acres. A third development area (Site 3 on the attached plan) is located on additional TOD acreage between Site 2 and the hotel site.

Exhibit Q.

---

[2] Although the Planning Board's July 10, 2019, agenda does not indicate lead agency would be established and the minutes are not available on the Town's website, review of the video shows the Board voting to establish itself as lead agency on that date.

69.     The Board's scoping document went further indicating the project had more than doubled from 19.63 acres to a total of 46 acres, added 275,000 sq. ft. of commercial/retail uses, 50,000 sq. ft. of office and 48 multi-family units on Sites 2 and 3. Exhibit R.

70.     Significantly, the scoping document did not disclose the proposed alienation of all or part of Lawton Terrace, Tiernan Court, Rielton Court or Gabriel Terrace nor did it identify that the development of Sites 2 and 3 was contingent upon the Town Board adopting a resolution to convey this property to Pyramid.

71.     On September 25, 2019, the Town Planner advised that Sites No. 2 and 3 had been assigned "a certain number of square feet… for potential buildout" of those parcels. The Town Planner did not identify that a Costco was proposed for Site No. 2.  9/25/18 Planning Board video at approximately 37 minutes and 40 seconds.

72.     The Board posted the "EIS Concept Plan," on its website and extended the scoping comment period until October 2, 2019. Exhibit S, "EIS Concept Plan."

73.     The Concept Plan did not name the four Town roads in the Lawton neighborhood required to be alienated for Pyramid's development of Sites 2 and 3. *Id.*

74.     In October, 2019, the Applicant conducted an archeological survey of the Lawton neighborhood and adjoining lands which included 68 shovel test pits. Exhibit B.

75.     Shovel test pits 2 and 13 appear to be dug on the Rielton Court right of way which extends east from the end of the pavement where Rielton Court dead ends. *Id.*

76.     Upon information and belief, there is no Town authorization on record allowing Pyramid or its affiliates to conduct testing on Town property,

77.     The Planning Board accepted the final scope for the DEIS on October 23, 2019.

78.    At that meeting, the Town Planner submitted a memorandum identifying the project's

entire environmental review could be completed as soon as January, 2020. Exhibit T.

79.    Pyramid delayed until November 15, 2019, to file an application for the development of

Costco on Site No. 2.  Rather than a subdivision or site plan application, it filed a special use

permit requiring approval from the Town's Zoning Board of Appeals. Exhibit U.

80.    Pyramid identified Site No. 2 as being "+/-16.5 acres," and James Soos, signed the

owner's certification, as he had for the Site No. 1 subdivision and site plan applications. *Id.*

81.    Mr. Soos identified himself as representing Crossgates Releaseco, LLC, and claimed

authorization from all property owners "to make this application."  *Id.*

82.    Attached to the application was a list of 26 tax parcels stated to be owned by defendant

Crossgates Releaseco, LLC. *Id.*

83.    Absent from Mr. Soos' list are the Lawton neighborhood roads and rights of way.  *Id.*

84.    Together, these Town roads and rights of way comprise 13.75%, (2.27 acres), of the 16.5

acres for Pyramid's Site No. 2. See Affirmation of James Bacon at ¶11.

85.    The 2019 Costco site plan mirrored the design and layout Pyramid drafted in 2017.

Exhibit V.

86.    On December 23, 2019, plaintiffs' counsel requested certain issues be reviewed in the

DEIS specific to Costco and emailed that request with attachments to the Town on December 24,

2019. Exhibit W.

87.    The attachments included a traffic analysis of a Costco proposed in Patterson, New York

by Michael Maris and Associates, (Exhibit W-1), and a retail market analysis by Ferrandino &

Associates, (F&A), done on behalf of Costco which had been proposed in Yorktown, New York.

Exhibit W-2.

88.     The Town Planner acknowledged receipt of counsel's correspondence and the Town's

website announced the Town had received a DEIS from the Applicant on December 24, 2019.

89.     Plaintiffs' counsel filed a request for the DEIS on January 10, 2020, pursuant to the New

York State Freedom of Information Law, (FOIL). Public Officers Law Article 6. Exhibit X.

90.     The Town denied the FOIL request on January 17, 2020, claiming the DEIS was "intra-

agency documentation." Exhibit Y.

91.     Plaintiffs' attorney appealed the denial and the Town posted the DEIS on its website on

January 30, 2020.

92.     The Town determined the DEIS complete on February 7, 2020 and set a public hearing

for March 11, 2020.

93.     Due to the Corona virus, the public hearing was canceled and then rescheduled for May

13, 2020, with a written comment period extended until May 26, 2020.

94.     Many Westmere residents, including the Harts and McDonalds, submitted comments

expressing concern as to the scale of Pyramid's development and impacts upon the environment,

including impacts upon wildlife in the Lawton woodlands. See DEIS comments included with

Affidavit of Lisa Hart.

95.     Plaintiffs hired F&A to examine the DEIS since F&A had conducted detailed analysis of

socio-economic impacts on behalf of Costco proposed in Yorktown, New York.

96.     F&A determined the DEIS did not include socio-economic studies and failed to address

significant impacts to community character, community services and traffic. Exhibit Z.

97.     James Calvin, chief executive officer of the New York Association of Convenience

Stores, a private, not-for-profit trade organization representing thousands of neighborhood

convenience stores and mini-marts statewide, expressed concerns as to the project's conformance

with the Town's zoning code and impacts on neighboring gasoline retailers. Exhibit AA.

98.     Wetland concerns expressed by members of the Save the Pine Bush organization resulted

in the Town releasing Pyramid's wetland report that had not been included with the DEIS on the

Town's website.  Exhibit BB.

99.     The wetland report showed federal jurisdictional wetlands confined to the east side of

Old Rapp Road. Exhibit CC.

100.     However, Pyramid's "existing conditions" site plan showed drainage easements and an

area of approximately 3200 feet west of the old road bed as sharing the same topographic

characteristics as the jurisdictional wetland.  Exhibit DD, Site Plan 3 of 20.

101.     Pyramid's archeological report also appeared to indicate wetlands west of the old road

bed as Map 2 indicated the federal jurisdictional area was part of the same drainage channel.

Exhibit B.

102.     And, the archeological report's photograph No. 18 showed the drainage area extending

west from the old road bed. Exhibit B.

103.     Dr. Kiviat also reported that "the western side of the south-north ditch may be part of this

wetland but was not included in the delineation." Dr. Kiviat recommended further investigation

of potential wetlands to the west of the old road bed. Exhibit C at pgs. 4 and 9.

104.     As above, Dr. Kiviat's comments indicated the Indiana Bat and NLEB were species that

could inhabit "suitable bark voids" in the Lawton woodlands and Sites 1-3 included habitat

potentially suitable for a New York Special Concern species known as the worm snake.

105.     As above, Dr. Kiviat noted no survey had been conducted for rare plants and that

the impact of removal of woodland habitat was not adequately assessed in the DEIS. *Id.* pgs. 5-6.

106.    Before Dr. Kiviat could complete his comments, the Town authorized the clear cutting of

the Lawton woodlands.

107.    Thus, at approximately 6:00 a.m., the morning of March 26, 2020, Mr. Hart was on his

way to work and noticed unusual activity on Lawton Terrace. He stopped his truck and took

several photographs though he was not certain what was planned. He notified his wife who at

7:00 a.m. heard the sound of chainsaws as trees were felled. (See Hart Affidavit at ¶¶20-21.)

108.    More than three hours after the tree cutting began, the Town posted the following notice

on its website:

> Tree Cutting to Begin on the Proposed Costco Site
> Posted on: March 26, 2020 - 10:17am
>
> The Town has been notified by the Pyramid Corporation that they intend to start
> tree cutting on March 26 on the site proposed for Costco.  Trees will be cut with
> the stumps to remain in place and no ground disturbance subject to stormwater
> and erosion control management requirements will take place.  The purpose of
> tree cutting at this time is to comply with United States Fish and Wildlife Service
> (USFWS) and New York State Department of Environmental Conservation
> (NYSDEC) regulations related to the Northern Long Eared Bat (NLEB), which is
> considered a threatened species.  Tree cutting is restricted from April 1 to October
> 31 without complying with a number of additional regulations or obtaining a
> permit from NYSDEC. During this period of time, NLEB are active and are
> within the forested landscape.
>
> No land use approvals have been granted for Costco by the Town of Guilderland.
> Trees are being cut to avoid potential impacts to the NLEB if the project is
> approved and site preparation for construction would take place after April 1 and
> prior to October 31.

109.    Pyramid proceeded to clear cut more than two acres of forest including mature trees up to

eighty years in age. (See Exhibit C, photographs therein and see Affidavit of Dr. Kiviat herewith

sworn to on April 24, 2020 at ¶10 and photographs therein.)

110.    The action came as a shock to the residents who knew that the project had not been

approved. (See Hart Affidavit at ¶20.).

111.    Pyramid was well aware that it was removing woodlands at Site No. 2 that could support

the NLEB and the Indiana bat:

> Vacant residential structures exist on site and a number of large trees such as
> cottonwood and red maple, including some older, broken individuals have the
> potential to provide summer roosting habitat for this species.

See Exhibit EE,  B. Laing Report at Appendix G, pgs. 20-21, identifying that the NLEB has "a

biology and life history very similar to the Indiana bat."

112.    Although the Town issued a cease and desist order, both the Town Supervisor and the

Town Planner asserted the tree cutting was authorized by NYSDEC in an interview with the

media, (Exhibit FF), and correspondence with Steve Wickham, an interested member of the Pine

Barrens advocacy group. Exhibit GG. Therefore, the threat of additional tree cutting remains.

113.    Dr. Kiviat inspected the clear cutting finding many mature trees had been cut down, some

with diameters of two feet or more. See Affidavit of Dr. Kiviat ¶¶10-13.

114.    The clear cutting is the latest in a series of defendants' unlawful actions that have caused

irreparable harm and represent an irretrievable commitment of resources committing municipal

defendants to a definitive course of action regarding the SEQRA and selection of alternatives.

115.    Participation in federal and state permitting proceedings and SEQRA is the only means

by which plaintiffs may protect their property interests and their health, welfare and safety prior

to being impacted by Pyramid's development.

116.    Defendants' unlawful actions demonstrate municipal defendants' unalterably closed mind

and predetermination of the outcome of the project's administrative review in violation of

plaintiffs' rights of due process as further detailed in the accompanying memorandum of law.

## FIRST CAUSE OF ACTION

### Defendants' clear cutting on Site No. 2 violated the Clean Water Act and New York's Environmental Conservation Law

117.    The allegations of the preceding paragraphs are incorporated here by reference.

118.    Defendants' clear cutting of Site No. 2 violated at least two sections of the Federal Water Pollution Control Act *a.k.a.* Clean Water Act (CWA). 33 United States Code (USC) §1251 et seq. (1972).

#### The CWA Section 402 violation

119.    Pursuant to Section 402 of the CWA, stormwater discharges from construction activities are unlawful unless they are authorized by a National Pollutant Discharge Elimination System (NPDES) permit or by a state permit program.

120.    New York administers the federally approved State Pollutant Discharge Elimination System (SPDES) program with permits issued in accordance with the New York State Environmental Conservation Law (ECL) Article 17, Titles 7, 8 and Article 70.

121.    "An owner or operator of a construction activity that is eligible for coverage under this permit must obtain coverage prior to the commencement of construction activity." SPDES General Permit for Stormwater Discharges from Construction Activity, Permit No. GP-0-20-001, ECL Article 17, Titles 7, I and Article 70; Effective Date: January 29, 2020.

122.    The Town and Pyramid violated Section 402 of the CWA, the ECL among other rules and regulations, by sanctioning, and accomplishing, the clear cutting of areas west of Lawton Terrace in the Town of Guilderland, New York on March 26, 2020 without a permit.

#### The CWA Section 404 violation

123.    Section 404 of the CWA establishes a program to regulate the discharge of dredged or fill material into waters of the United States, including wetlands.

124.    Section 404 requires a permit from the United States Army Corps of Engineers, (ACOE), before dredged or fill material may be discharged into waters of the United States.

125.    Defendants violated Section 404 of the CWA, the ECL and potentially other regulations, by sanctioning, and accomplishing, the clear cutting of areas west of Lawton Terrace on March 26, 2020, causing discharges of fill material into federal wetlands on Site No 2.

## SECOND CAUSE OF ACTION

### Defendants' clear cutting on Site No. 2 violated the Endangered Species Act

126.    The allegations of the preceding paragraphs are incorporated here by reference.

127.    Defendants violated the notice and consultation requirements of the Endangered Species Act (ESA). 16 U.S. Code § 1536.

128.    All federal agency actions, (such as granting a permit), require certain procedures where impacts may affect federally listed threatened and endangered species.. 50 CFR §402.14(a).

129.    CWA Section 402 and 404 permits are no exception, especially when the permitting involves a major construction project such as proposed for Site No. 2.

130.    Indeed, the ACOE's Nationwide Permit General Condition No. 18 specifically states that no activity may be authorized if it will directly or indirectly jeopardize a threatened or endangered species.

131.    Defendants knew Site No. 2 contained habitat for the NLEB and the Indiana Bat and cut down the trees specifically to prevent those species from using Site No. 2 for nesting and roosting.

132.    Defendants violated the ESA by clear cutting Site No. 2 prior to the issuance of permits and before the ACOE and the USFWS could review potential impacts upon threatened and endangered species.

### THIRD CAUSE OF ACTION

### The Guilderland Planning Board's SEQRA violations

133.    The allegations of the preceding paragraphs are incorporated here by reference.

### i.    Failure to comply with coordinated review requirements

134.    SEQRA requires circulation of environmental impact information to all other agencies with permitting authority, before the establishment of lead agency. 6 NYCRR 617.6(b)(3)(i).

135.    The November 19, 2018, EAF identified the project as a Type 1 action requiring coordinated review. Id.

136.    After its initial meeting on the project on December 12, 2018, the Board circulated an EAF for the project on Site No. 1 in February 2019.

137.    The Board received comments from other involved agencies and voted to establish itself as lead agency on July 10, 2019.

138.    Until August 14, 2019, the project was described as 222 residential units limited to Site No. 1. Both EAFs from November 19, 2018 and July 19, 2019 identify no commercial component or any development on Sites 2 and 3.

139.    All review letters by involved agencies considered a residential project on Site 1.

140.    And, on August 14, 2019, NYSDEC published an ENB notice identifying the project as residential use limited to Site No. 1.

141.    Then, the Board issued a draft scoping document identifying that the project had more than doubled in size added significant commercial and office uses and multi-family units on two new sites (Sites 2 and 3). (See above at ¶69.)

142.    The Board did not rescind its lead agency status nor re-circulate a revised EAF detailing the environmental inventory of Sites 2 and 3 and the project's expanded scope.

143.    Pyramid further delayed submitting a special use permit application for Site No. 2 and added an involved agency – the Zoning Board of Appeals – that was not identified in the EAFs. As above, this information was not circulated prior establishment of lead agency.

144.    The Board's incomplete EAFs and depriving other involved agencies of complete project information prior to the establishment of lead agency violates 6 NYCRR 617.6(b)(3) (i).

      **ii.    Engaging in improper segmentation**

145.    Considering only a part or segment of an action is contrary to SEQRA.

146.    The conveyance of Westmere Terrace Town property is a pre-requisite for the development of Site No. 1.

147.    The Town's required approval of this property transfer is not disclosed in the project's EAF, positive declaration or scoping document.

148.    In August 2019, the project expanded from the development of only Site No. 1 to include developing two additional sites requiring further alienation of 2.6 acres of Town property in the Lawton neighborhood.

149.    The conveyance of Town property in the Lawton neighborhood is a pre-requisite for the development of Sites 2 and 3.

150.    The Town's required approval of this property transfer is not disclosed in the project's EAF, positive declaration or scoping document.

151.    Because the conveyance of Town property is part of the action under SEQRA review, environmental impact issues, such as whether the conveyance conflicts with the Town's land use plans, must be identified and considered as part of the project's SEQRA review.

### iii.    Clear cutting areas of Site No. 2

152.    SEQRA requires that "[a] project sponsor may not commence any physical alteration related to an action until the provisions of SEQR have been complied with" i.e., the lead agency has issued a Negative Declaration or Findings. 6 NYCRR 617.3(a).

153.    However, on March 26, 2020, municipal defendants allowed corporate defendants to clear cut more than 2 acres of forest located west of Lawton Terrace on Site No. 2.

154.    Defendants' SEQRA violations demonstrate an unalterably closed mind requiring re-establishment of lead agency status in order that reasonable alternatives are considered and significant environmental impacts are mitigated to the maximum extent practicable.

### FOURTH CAUSE OF ACTION

**Municipal Defendants Planning Board and Zoning Board of Appeals
do not have jurisdiction to consider Pyramid's land use applications**

155.    The allegations of the preceding paragraphs are incorporated here by reference.

156.    The Town's subdivision, site plan and special use permit applications require certification that the applicant is authorized to proceed on the property owner's behalf that is proposed for development.

157.    However, Pyramid has not submitted a site plan or subdivision application for the development of Site No. 2 and the consolidation of tax lots therein which includes Town properties in the Lawton neighborhood.

158.    Thus, the Town is unauthorized to continue reviewing Pyramid's land use plans for Site No. 2.

159.    Further, Pyramid's subdivision and site plan applications for Site No. 1 and its special use permit application to develop a Costco on Site No. 2 are void as a matter of law.

160.    Specifically, Pyramid's agent James Soos, signed these applications certifying that he had authorization from all the property owners for the development of Sites 1 and 2.

161.    He does not. Pyramid does not own or control the Town's roads or rights of way in the Westmere and Lawton neighborhoods.

162.    The Town's Westmere cul-de-sac covers approximately 0.5 acres of Site No. 1.

163.    As above, the Town also owns the roads of Lawton Terrace, Tiernan Court, Rielton Court and Gabriel Terrace and rights of way which total approximately 2.7 acres on Sites 2 and 3, (13.75%, [2.27 acres], of the total acreage of Site No. 2.)

164.    Because Pyramid is unauthorized to sign the Town's site plan, subdivision and special use applications to develop Town property, the Town's Planning Board and Zoning Board of Appeals do not have jurisdiction to continue to review those applications.

165.    In the alternative, the Town's tacit approval in allowing Pyramid to proceed with its land use applications to develop over 3 acres of Town-owned property is an unauthorized substitute for the requirements of New York State Town Law §64(2).

166.    Town Law §64(2) requires a formal resolution to transfer municipal property rights and is subject to a permissive referendum. (Town Law §90.)

## FIFTH CAUSE OF ACTION

### Municipal defendants' actions have predetermined the outcome of its SEQRA review violating plaintiffs' rights of Due Process

167.    The allegations of the preceding paragraphs are incorporated here by reference.

168.    Under the Fourteenth Amendment of the United States Constitution, plaintiffs' due process rights include the Town of Guilderland adhering to all laws impacting their property interests.

169.    This includes compliance with SEQRA's non-discretionary procedures requiring the lead agency to identify, review and choose among reasonable design and layout alternatives that will minimize environmental impacts to the maximum extent practicable.

170.    Plaintiffs' due process rights prohibit the Town from predetermining outcomes and conducting an environmental review with an unalterably closed mind.

171.    The Supreme Court has enunciated two alternative tests by which substantive due process is examined and the facts here meet both tests. (See herewith memorandum of law.)

172.    The Town's actions have culminated in Pyramid clear cutting more than two acres of woodlands on Site No. 2.

173.    What is shocking from an objective standpoint is that Pyramid cut down the trees during the comment period for the DEIS, knowingly and willfully to prevent threatened and endangered species from using the site's trees for nesting and roosting.

174.    Further shocking is the fact the clear cutting violates fundamental provisions of the CWA, the ESA, the ECL and SEQRA.

175.    And, Pyramid did not even file a subdivision approval application or a site plan application, (as it did for Site No. 1), before cutting down the trees.

176.    Also, contrary to SEQRA and Town Law 64(2), Pyramid is proceeding with its land use applications proposing to develop over three acres of Town property without identifying same in the original or revised EAF and without official authorization.

177.    SEQRA also required the Town to advise involved agencies of the true scope and magnitude of the project prior to establishing itself as lead agency on July 10, 2019.

178.    Other SEQRA violations involve the delayed submission of the Costco plans until November, 2019, the Town's failure to release Pyramid's wetland delineation report until ten

weeks after acceptance of the DEIS, the project's non-compliance with town zoning requirements and the Town accepting the DEIS despite incomplete data with regard to the environmental inventory and impacts thereto.

179.    Defendants have thus undermined SEQRA's purpose which is to identify environmental resources,  identify reasonable alternatives and choose alternatives that minimize, to the maximum extent practicable, impacts to the environment before causing environmental damage.

180.    Finally, when the public attempted to obtain a copy of the DEIS, the Town denied the request on the unfounded claim it was an "intra-agency documentation,"  contrary to the Freedom of Information Law. (N.Y. Public Officer's Law Article 6.)

181.    Thus, defendants' illegal conduct meets the "fundamental procedural irregularities" due process threshold discussed in the herewith memorandum of law.

182.    Regarding plaintiffs' property interests, SEQRA imposes non-discretionary responsibilities upon the lead agency which have been flouted. (See herewith memorandum of law.)

183.    And, Mr. and Mrs. Hart and Mr. and Mrs. McDonald are within the zone of interests SEQRA is designed to protect as their homes and property are immediately adjacent to Pyramid's property comprising Site No. 1, and the Harts are directly across the street from Site No. 2 where the clear cutting occurred.

184.    The development of Site No. 1 also proposes to convert a portion of the McDonald's front lawn into part of a relocated cul-de-sac.

185.    A house directly across the street from the McDonalds is proposed to be demolished providing Site No. 1 additional development area now owned by the Town and enjoyed by the Westmere residents as a quiet turnaround.

186     Further, the 5-story residential units on Site No. 1 will appear over the McDonald's home representing an invasion of their privacy.  The McDonald's property and health interests will also be impacted by the noise and dust created by construction on Site No. 1.

187.     Mr. and Mrs. Hart will be negatively impacted as their property is right across the street from Site No. 2.

188.     Both the Harts and the McDonalds have already suffered a negative impact by the increase of noise and lights entering their homes as a result of the loss of the trees on Site No. 2 which buffered the sound of traffic and lights from Western Avenue east of Westmere Terrace.

189.     The Harts and McDonalds also use the tree lined streets of the Lawton neighborhood for quiet recreation for themselves and families.  However, the Lawton neighborhood and its woodlands will be converted into impervious surfaces, parked cars and a 160,000 sq. ft. retail store with a fueling facility forever terminating their enjoyment of that area.

190.     The Harts will be exposed to nuisance levels of noise, motor vehicle exhausts, petroleum odors from the hundreds of vehicles proposed to use Costco's entrance every hour with peak hours on Saturdays. Costco's entrance is less than 250 feet from the Hart's property and their second story bedroom window will be directly in the line of site of Costco's utility poles which range from 30 to 36 feet in height.

191.     Plaintiff 1667 Western Avenue, LLC, owns property which is bordered on the east, north and west by Site No. 3.

192.     As above, Site No. 3 is to be developed with 115,000 sq. ft. of commercial/retail uses, 50,000 sq. ft. of office and 48 multi-family units.

193.    The construction on Site No. 3 will negatively impact plaintiffs' property and their employees health and safety by subjecting the property and employees to months of dust and noise from the clearing and construction of Sites 2 and 3.

194.    The property interests of Red-Kap Sales, Inc. will be negatively impacted as it operates a Mobil station surrounded by Site No. 3.  In addition to being impacted by noise and dust from the construction of Site No. 3,  once operational, Site No. 2 will impact community character and services to the degree where plaintiffs' Mobil station and convenience store may have to abandon the site.

195.    And, the Town has impacted plaintiffs' property interests by tacitly allowing Pyramid to unlawfully assume control over Town property without formal conveyance of the properties pursuant to Town Law §64(2), thereby depriving the public from timely and meaningful opportunity to petition for a permissive referendum. Town Law §90.

196.    Plaintiffs have been involved in the SEQRA process since their counsel first submitted comments on the final scope urging analysis of community character impacts.

197.    Plaintiffs' consultants F&A have identified significant errors and omissions in the DEIS and James Calvin has raised serious issues as to whether a big box store selling gasoline is a use permitted by the Town Code.

198.    Further, Dr. Kiviat has identified that environmental studies are inadequate or incomplete.

199.    As participants in the SEQRA process seeking to protect their property interests, plaintiffs are entitled to a neutral, fair and reasoned response to all of the issues raised by responsible experts.

200.    And, while SEQRA requires the lead agency to consider reasonable reductions in project scale and re-locating project components, the clear cutting of Site No. 2 has rendered the lead agency's environmental review a hollow exercise and set off a bureaucratic steam roller violating plaintiffs' substantive due process rights.

201.    The clear cutting prevents the Town from meeting its SEQRA obligation that it "shall act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable." ECL §8-0109(1).

202.    Instead, the Town has inflicted a "procedural injury that will start the wheels moving, inexorably, toward completion of the project's current design," in violation of plaintiffs' due process rights under the U.S. Constitution's 14th Amendment. (See herewith memorandum of law.)

## IRREPARABLE INJURY

203.    The allegations of the preceding paragraphs are incorporated here by reference.

204.    The clear cutting on Site No. 2 has caused irreparable injury as some of the trees cut down were in excess of 80 years old.

205.    The clear cutting represents an irretrievable commitment of resources and significant physical alteration of the property in direct violation of SEQRA's requirement that site disturbance does not commence until completion of the SEQRA process.

206.    The clear cutting also manifests a predetermination to develop of Site No. 2 in the manner preferred by Pyramid rather than allowing the lead agency to examine and choose from reasonable alternatives that minimize the project's environmental impacts to the maximum extent practicable while still meeting Pyramid's reasonable development expectations.

207.    Monetary damages at a later time will not adequately compensate for the plaintiffs' due process injuries sustained as a result of the events described above.

## **RELIEF SOUGHT**

Plaintiffs respectfully request that this Court issue an order pursuant to 42 U.S.C. §1983:

1.    Enjoining any further tree cutting on sites 1-3 pending completion of the SEQRA process and issuance of all applicable federal and state permits, and;

2.    Enjoining the Planning Board of the Town of Guilderland from conducting further SEQRA review as lead agency, and;

3.    Requiring re-establishment of lead agency pursuant to 6 NYCRR 617.20 after amendment and re-circulation of Parts 1 and 2 of the EAF which must include information concerning the environmental impacts from the proposed development of Sites No. 2 and 3, including alienation of Town properties in the Westmere and Lawton neighborhoods, and;

4.    Enjoining further Town administrative land use review for Sites 1-3, as the Town Planning Board and Zoning Board of Appeals do not have jurisdiction to consider Pyramid's development plans absent Town authorization regarding the use or alienation of Town-owned property in Westmere Terrace, Lawton Terrace, Tiernan Court, Rielton Court and Gabriel Terrace, and:

5.    Enjoining further Town administrative land use review of Site No. 2, pending Pyramid's submission of subdivision and site plan applications, and;

6.    Granting plaintiffs their costs of suit including reasonable attorney fees to the extent permitted by law; and

7.    Granting plaintiffs such further relief as the Court may deem just and proper.

## **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

 Respectfully submitted this 25th day of April, 2020.

James Bacon

Attorney for Plaintiffs
N.D.N.Y. Bar No. 700116
baconesq@yahoo.com
P.O. Box 575
New Paltz, New York 12561
Telephone: (845) 419-2338